# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TRAVIS RYAN ROWLEY,

      **Plaintiff,**

**v.**                                   **Case No. 10CV1182  WJ/GBW**

APD DETECTIVE KEVIN MORANT,
APD DETECTIVE MICHAEL FOX,
APD DETECTIVE FRANK FLORES,
CHIEF OF POLICE RAY SCHULTZ,
The CITY OF ALBUQUERQUE, and
JASON MORALES,

      **Defendants.**

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S CORRECTED MOTION FOR RECONSIDERATION OF COURT'S MEMORANDUM OPINION AND ORDER (DOC. 188) GRANTING INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY
### and
### DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT

THIS MATTER comes before the Court upon Plaintiff's Corrected Motion for Reconsideration of Memorandum Opinion and Order (Doc. 188) Granting Individual Defendants' Motion for Summary Judgment Based on Qualified Immunity, filed October 6, 2014 (**Doc. 192**) and Plaintiff's Motion for Leave to Amend Complaint, filed November 3, 2014 (**Doc. 193**).   This order is the last go-round in a case that should have ended with the Court's previous rulings on the individual Defendants' motion for summary judgment.  The Court kept the case open for a single purpose: to allow Plaintiff's counsel to present additional evidence that the video recordings of Plaintiff's interrogation had been tampered with, as Plaintiff's counsel alleged.  The Court finds that counsel has not presented such evidence, and for this reason, the

Court shall deny both of Plaintiff's motions.

## BACKGROUND

The underlying facts in this case are set forth in detail in the Court's Memorandum Opinion and Order granting summary judgment to the individual defendants (Doc. 188).[1] Briefly stated, Albuquerque Police Department ("APD") detectives were investigating the murders of Tak Yi and Pun Yi in December of 2007.  Plaintiff Rowley and Michael Lee, his co-worker were seen in the Yi's neighborhood in the days prior to their murders.  Plaintiff and Lee were arrested for the two homicides and subsequently, during one of the interviews with APD detectives, Plaintiff confessed to the murders and implicated Lee as well.  After the grand jury indictment and Plaintiff's pretrial detention, additional information regarding the murders came to light in mid-2008.  DNA evidence from the crime scene was matched to another individual, serial killer Clifford Bloomfield, who later confessed to murdering the Yi's.  Despite the DNA evidence linking Bloomfield to the murders, the District Attorney for the Second Judicial District proceeded with the charges against Plaintiff until March of 2009 when the charges against Plaintiff and Lee were dismissed and the two were released from jail.  *See* Doc. 188 at 1-3.

After Defendant's motion for summary judgment based on qualified immunity was fully briefed, Plaintiff filed, without leave of Court, a Supplement to his Response to the Motion for Summary Judgment, making the allegation that the videos of APD's interrogation of Plaintiff were doctored in such a way to mislead the viewer about what took place during the interrogation.  The Court was concerned about these new allegations because they had not been properly raised by Plaintiff's counsel.  In fact, Plaintiff's counsel raised these new allegations for the first time in an unauthorized supplemental pleading which did not allow Defendants the

---

[1]  The City Defendant was dismissed for failure to state a claim (Doc. 189).  That ruling is not at issue here.  The Court's other rulings in this case can be found in the following Memorandum Opinions and Order: Docs.166, 171 and 189, in addition to the decision challenged by Plaintiff here (Doc. 188).

chance to respond.  Further, the allegations were supported solely by an affidavit by Plaintiff's investigator who did not purport to be an information systems expert such that he would be qualified to give an expert opinion about whether the videos were manipulated through the use of technology.  Doc. 188 at 4; *see also* Doc. 180-1.  The Court granted summary judgment to the individual defendants based on qualified immunity, but allowed Plaintiff's counsel an opportunity to present additional evidence concerning these allegations by a qualified individual and to set forth in a procedurally proper manner the reasons why the Court should reconsider its decision on qualified immunity.  Doc. 188 at 3-4.  Plaintiff responded by filing the two instant motions.   Plaintiff's request for leave to amend the complaint is somewhat premature, since the basis for the motion to amend hinges on whether Plaintiff's counsel presents additional evidence in his motion to cause the Court to reconsider its decision to grant summary judgment to the individual defendants based on qualified immunity.   For this reason, the Court will first address Plaintiff's motion to reconsider.

## DISCUSSION

### I.     Plaintiff's Motion to Reconsider (Doc. 192)

As Defendant notes, Plaintiff fails to identify whether his motion is brought under Rule 59(e) or 60(b).   In fact, Plaintiff seems oblivious to the notion of setting out a legal basis for relief sought, as there is no mention of either Rule 59 or 60 anywhere in his motion until his reply in which states that he seeks relief under Rule 59(e).

Rule 59(e) is appropriate where there is (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.  It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.  *Servants of the Paraclete v. Does*, 204 F.3d 1005,

1012 (10th Cir. 2000) (citations omitted). Plaintiff does not mention whether any of these requirements apply. He does not contend there has been a change in the law or that there is a need to correct clear error or prevent manifest injustice. Further Counsel is not contending that the "additional evidence" was not available—only that he has a justifiable excuse for not thinking of obtaining the evidence before now. However, there is another reason why Plaintiff cannot seek reconsideration under Rule 59(e). A motion under Rule 59(e) seeks to "alter or amend a *judgment.*" When reconsideration is sought from an interlocutory order on a motion to dismiss or summary judgment, Rule 59(e) is not appropriate. *See Jones v. Bernanke*, 557 F.3d 670, 677-78 (D.C.Dir. 2009) (denial of summary judgment is interlocutory in nature and therefore not a proper basis for a Rule 59(e) motion); *see* Fed.R.Civ.P. 54(a) ("Judgment" as used in these rules includes a decree and any order from which an appeal lies"). Because the Court has not entered a final judgment in this case, Plaintiff's motion cannot properly be considered under Rule 59(e).

Rule 60(b) also would not provide the relief Plaintiff seeks, although he does not bring this motion under that rule. A Rule 60(b) motion may seek "relief from a *final judgment* or an "order or proceeding." If Plaintiff means to seek relief under Rule 60(b)(2)—since Plaintiff appears to be seeking reconsideration based on additional evidence—he must satisfy all of the following: (1) that the evidence in question has been newly discovered since trial (or Order, in this case); (2) that he was diligent in discovering the new evidence; (3) that the new evidence is not merely cumulative or impeaching; (4) that the new evidence is material, **and** (5) that a reconsideration of the Defendants' summary judgment motion with the addition of this new evidence, would probably produce a different result. *See Dronsejko v. Thornton,* 632 F.3d 658, 670 (10th Cir. 2011); *General Universal Systems, Inc. v. Lee,* 379 F.3d 131, 158 (5th Cir. 2004).

4

If *any* of these requirements are not met, the Rule 60(b)(2) may be denied. *See McCormack v. Citibank, N.A.,* 100 F.3d 532, 542 (8th Cir. 1996). Plaintiff cannot avail himself of relief under Rule 60(b)(2), either because as the Court's analysis unfolds, it will become clear that Plaintiff would not be able to meet any of these requirements.

Because there is no final judgment in this case in order to rely on Rule 59(e), and because Plaintiff cannot meet any of the Rule 60(b) requirements, the Court will treat Plaintiff's motion as simply a request for the Court to revisit or reconsider its earlier ruling. *See Jones v. Bernanke,* 557 F.3d at 678 (denial of summary judgment is "equivalent to a permissible reconsideration of its original denial of summary judgment"); *see Langevine v. Distr. of Columbia,* 106 F.3d 1018, 1023 (D.C.Cir. 1997) ("Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment."). A motion to reconsider is appropriate where a court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the court by the parties, or has made an error not of reasoning, but of apprehension. *Huff v. UARCO, Inc.*, 925 F.Supp. 550, 561 (N.D.Ill. 1996).

Under any of the above standards, the Court would reject any invitation by Plaintiff's counsel to revisit old arguments and issues. Plaintiff contends that the Court has been under a misapprehension of the facts, but this contention is an unabashed attempt to revisit this Court's previous findings. For example, Plaintiff's counsel advances the argument that defense counsel has not properly explained "uncontroverted facts" as to the Yi's time of death and Plaintiff's alibi. These issues have been addressed in the underlying state court criminal proceeding carefully considered in this Court's previous rulings, and have absolutely nothing at all to do with the sole issue on which the Court allowed Plaintiff's counsel to proceed: namely, the question whether there is additional evidence related to Plaintiff's allegations that the video

recordings of Plaintiff's interrogation were doctored in such a way to mislead the viewer about what took place during the interrogation.

A.   Previously Considered Facts and Issues

In reviewing Plaintiff's motion to reconsider, the Court makes the same observation as do Defendants:  that Plaintiff has totally ignored the Court's directives and instead has set out to resurrect old arguments and old claims which the Court has already considered and on which it has already ruled.[2]   The Court also agrees with Defendants that Plaintiff's motion to reconsider suffers from the same incoherence as did the response to Defendants' motion for summary judgment (*see* Doc. 188 at 5, noting Plaintiff's failure to comply with Court's local rules in responding to summary judgment motion).   Moreover, Plaintiff's counsel presents his facts by using a method of grouping facts into subsets of subsets, which makes the presentation of facts unnecessarily difficult to follow, especially when the information within those facts often are not presented in a coherent manner.   For example, the "Disputed Facts" under paragraph 4 are further subdivided from 4.1 to 4.17, and the "Additional Facts" under paragraph 5 are further numbered as 5(a) to (aa), and then (ab) to (ag).

Despite this haphazard presentation of facts by Plaintiff's counsel, defense counsel has undertaken a meticulous and thorough review of those facts, and the Court agrees that the bulk of these facts and issues have already been addressed by the Court, or have no relevancy at all. There is no point in sifting through all these facts.   The Court agrees with and hereby adopts Defendant's characterization of certain facts and issues which have been thoroughly discussed and addressed by the Court in previous briefings and rulings and, therefore, which are not proper

---

[2]   For example, Plaintiff returns to arguments and facts leading up to Plaintiff's arrest and indictment and which have nothing at all to do with the question of whether the interrogation videos were tampered with.  *See* Doc. 192 at 5-7.

grounds to be rehashing in a motion to reconsider.   The Court has no intention of listing every one of the numerous facts and issues which Plaintiff attempts to relitigate here, but some examples will be sufficient to demonstrate the tenor of the majority of facts presented by Plaintiff's counsel, and which are discussed in Defendant's brief at Doc. 196 at 16-21:

> Doc. 192 at 6, ¶a (timeframe of murders);
>
> Doc. 192 at 8-9, ¶ i   and p. 9, ¶ k (statements by Plaintiff during the interrogations);
>
> Doc. 192 at 7-8, ¶¶ e, f, & g (alleged false statement by detective about receipt showing sale to murder victims);
>
> Doc. 192 at 3-4, ¶4.9 (whether Plaintiff confessed to details of the murders that could only have been known by someone at the scene);
>
> Doc. 192 at 4 (issue of mental status);
>
> Doc. 192 at 3, ¶4.5 (characterization of Plaintiff's statements regarding his whereabouts on December 4, 2007.[3]

All of the above facts and issues were previously litigated and were part of the qualified immunity proceedings.   Other facts presented by Plaintiff have no purpose or relevance.   *See* Doc. 192 at 9-10, ¶¶ m, o, p, w, ab, ac, & ad (claiming that detectives left Plaintiff alone and returned five minutes later, and discussing policy requirements for the APD).    Plaintiff also reargues the issue of whether Plaintiff's confession was sufficient to establish probable cause. *See* Doc. 192 at 19.   This too has been briefed by the parties, extensively considered by the Court, *see* Doc. 188 at 7-17, and will not be reconsidered further.

B.    *Miranda* Violation

---

[3]   Defendants also cite to other issues from Plaintiff's previous Motion to Reconsider (Doc. 191), which has been superseded by the instant motion.   The parties have stipulated to Doc. 192 (the instant motion) as the "corrected version" (*see* Doc. 194, Stip. Order); nevertheless, Defendants have included some facts and issues from the previous motion, such as Plaintiff's reference to the "green" cards providing details of Plaintiff's work activity.   *See* Doc. 196 at 26 (noting issue was addressed in Court's previous Order granting summary judgment to Defendants). Because of the parties' stipulation, the Court's analysis here will exclude any discussion on facts and issues raised in Plaintiff's previous motion to reconsider that is not included in the instant motion.

Plaintiff sets forth a factual argument about being advised of his *Miranda* rights, but it is not clear whether the thrust of this argument is that Plaintiff was *not* given his *Miranda* rights, or whether he was given those rights and requested counsel but continued to be interrogated.   *See* Doc. 192 at 3, ¶ 4.6 (disputing that Plaintiff was advised of *Miranda* rights); at 10, ¶ n (no record of invoking counsel or subsequent waiver).   Either way, this issue is inappropriate for the Court's reconsideration for two reasons.   First, the Court has already ruled on Plaintiff's alleged *Miranda* violation, which was raised by the parties in the pleadings on Defendant's motion for summary judgment.   The Court concluded that the voluntariness of Plaintiff's' confession, as well as the *Miranda* issue, was decided in the underlying criminal proceedings and that Plaintiff was precluded from relitigating the issue.   *See* Doc. 188 at 3-4, 25-26.

Second, Plaintiff's counsel claims that he only recently became aware of the fact that the recordings were allegedly altered when Defendants "admitted" on summary judgment that Plaintiff requested a lawyer.   *See* Doc. 193 (motion to amend) at 2, ¶¶6, 8.   Counsel blames Plaintiff's seven years old "vague memory" as being insufficient to realize that he had requested an attorney when the sworn statements of the detectives, and the interrogation recordings suggested otherwise.   Doc. 193 at 4, ¶ 14.   However, both Plaintiff and his attorney (current counsel, Mr. Stephen Aarons, also represented Mr. Rowley in the criminal case) were both aware of a potential alleged *Miranda* violation at the time it occurred, years before filing this lawsuit, based on Plaintiff's own deposition statements which were read into the record at the Court's oral argument on Defendant's motion for summary judgment:

> And in his deposition that was taken in the presence of Mr. Aarons and – and – and Mr. Boland sitting right next to him, I asked him specifically, and – and this is at Document 122.1 that's attached to our motion for summary judgment, I said, Now, you were given your Miranda rights for each interview session, were you?
> Answer. Yes, I was.

| | | |
|---|---|---|
| Question: | Did you ever ask for an attorney? | |

Question:     Did you ever ask for an attorney?

Answer:        Once.

Question:     When?

Answer:        I don't remember when it was.

Question:     What was it, you just don't recall?

Answer:        I don't remember when it was. I mean, it was a heated part, and I said, ah, fuck it, I just want an attorney.

Question:     And what was the response?

Answer:        They shut up, waited five minutes, came back in and let the shit calm down, I believe, and I calmed down, and we went on. clear that anything you said could and –" He cut me off. He says, 'No excuse me. Defendant Fox came in and asked me if that's really what I wanted, and I said, no, I just want to get this done and go home.

Question:     So he did follow up, check with you?

Answer:        Yes, he did.

Doc. 195, Tr. of Defts' Mot. for Sum.J., pp. 12:7-13:7, attached ad Ex. B.   Defendants had referred to Plaintiff's deposition statements in their summary judgment brief, stating that Plaintiff "felt comfortable telling Detectives he wanted a lawyer, then deciding to continue the interview without one."   Doc. 122, Statement of Fact 24.[4]   Thus, Plaintiff and counsel admittedly knew that Plaintiff had requested an attorney—or at least the he had *claimed* he had requested an attorney—years before this litigation started; and both knew that recordings of the interrogation had been made.   Given that Plaintiff could have, but failed to raise the alleged

---

[4]   As Defendants note, Plaintiff's testimony is not an "admission" by Defendants, contrary to Plaintiff's contention. Defendants were justified in using Plaintiff's own testimony against him in their qualified immunity motion.   Since Plaintiff did not respond to Defendant's Statement of Fact No. 24 with any material fact to negate or dispute it, that fact is considered to be undisputed.   Also, Defendants are correct in noting that deeming a fact as undisputed does not necessarily mean it is credible.   *See* Doc. 197 at 4.   For purposes of this discussion, the Court may include Plaintiff's testimony as to his request for counsel and subsequent revocation as undisputed evidence on the record.

constitutional violation relating to allegedly altered tapes previously, he should not be able to raise it now in a motion to reconsider.  *See Servants of Paraclete,* 204 F.3d at 1012.   The Court has nevertheless allowed Plaintiff's counsel the opportunity to present the issue here since it was raised for the first time during the summary judgment proceedings without allowing Defendants the opportunity to respond.

Finally, the significance of the alleged tampering of the interrogation recordings is still not clear to the Court.  There has been no attempt by Plaintiff's counsel throughout the motion to reconsider and the reply to articulate why the alleged tampering, even if true, should result in reconsideration of the Court's qualified immunity ruling.  It is undisputed that the recorded videos and transcripts which are at the center of this legal maelstrom do not show that Plaintiff ever requested an attorney.   Plaintiff attempts to create an issue regarding whether the recordings were tampered with, but does not explain what specific evidence the alleged tampering has excluded.   Plaintiff cannot really argue that he requested counsel but did not revoke that request, since his own deposition testimony indicates he did exactly that: he requested counsel and then decided to waive that right and go on with the interview to get it over with.  Perhaps realizing that the recordings do not support Plaintiff's claim of what occurred during the interrogation, Plaintiff's counsel tries to sidestep this problem by discounting his client's admissions.  He points to a statement made by Detective Morant to Randy Chavez, Mr. Aaron's co-counsel in the criminal case, that "nothing of any significance" was said during the interrogations of Rowley and Lee that was not captured onto the available audio recordings.  Doc. 192 at 14 (citing Randy Chavez Aff., Doc. 191-2 at 2, ¶¶4-5).   From this statement, Plaintiff's counsel implies that if Plaintiff's request for counsel is not on the recordings, it could not have been made.   However, this argument goes nowhere, because Detective Morant's

statement to Mr. Chavez cannot be read to negate or impeach Plaintiff's deposition admission
that he had requested counsel and then revoked that request.

C.    Arguments Related to Confession

Plaintiff raises two other issues yet again.   He argues that collateral estoppel does not
apply to preclude him from arguing that his confession was coerced, and that the Court should
not have relied on his confession to establish probable cause.   These issues have already been
briefed by the parties and considered by the Court in the summary judgment pleadings.    The
Court ruled that Plaintiff was precluded from relitigating the issue that his confession was
coerced *See* Doc. 188 at 7-8 (". . . Plaintiff focuses on whether he had a full and fair opportunity
to litigate this issue in the criminal case and whether the state court's denial of the motion to
suppress is as final judgment") and at 12-17 (finding that Defendant Officers had probable cause
to arrest Plaintiff when they drafted the arrest warrant based on his confession).   Plaintiff raises
exactly the same arguments again here, but offers no legal or factual basis for the Court to
reconsider those rulings.[5]

In granting Defendants' motion for summary judgment, the Court also addressed
Plaintiff's argument that the state court's ruling on the motion to suppress was not a final order
and therefore not appealable.   In its Memorandum Opinion and Order, the Court's analysis of the
relevant law ended with the conclusion that the ability to appeal was not a factor in considering
the applicability of the collateral estoppel doctrine.   *See* Doc. 188 at 11; *see State ex rel. Sofeico
v. Heffernan,* 41 N.M. 219, 234, 67 P.2d 240, 249 (1936) (stating that a judgment that is not
appealed becomes "res judicata as to any and all future litigation between the same parties" involving
the question resolved); *In re Estate of Duran*, 141 N.M. 793, 798 (Ct.App. 2007) (discussing

---

[5]   Despite defense counsel's admonition to Plaintiff's counsel that these issues have already been addressed and
ruled on and are therefore inappropriate to raise in a motion to reconsider,  Doc. 196 at 27-28 , Plaintiff raises these
identical issues yet again in the Reply.

collateral estoppel and appeals and stating "[l]itigants who do not appeal from an adverse decision are stuck with it.") (citation omitted).

In the instant motion, Plaintiff offers the "additional fact" in the form of a statement made by one of his attorneys in the criminal case, Randy Chavez, that there was a request to certify the denial of the motion to suppress for interlocutory appeal.  Doc. 191 at 14, ¶ ag (citing to Chavez Aff., Doc. 191-2 at 1, ¶2).[6]  Mr. Chavez's claim, however, conflicts with the representation made by Plaintiff's counsel at oral argument on the summary judgment motion that no request for interlocutory review of the state court's ruling on the motion to suppress had been made.  *See* Doc. 195 (Tr. of Defts' Mot. for Sum. Judgment) at 50:7-9, attached as Ex. B to Resp.).   Thus, as Defendants have observed, there are two conflicting statements by counsel as to whether a request was made for interlocutory review, but no actual record to support the claim that a request was ever made.   *See* Doc. 196 at 25, n.25.  This conflict need not be addressed, however, since the question of whether or not Plaintiff sought an interlocutory appeal is immaterial to the collateral estoppel analysis.

The foregoing discussion has addressed facts, issues and arguments raised in Plaintiff's motion to reconsider which have either been previously addressed and decided, or are decidedly irrelevant.  The next section addresses whether Plaintiff has presented any evidence of tampering with the video recordings, and whether there is any merit to such claims.

D.     Whether Videos Were Altered as Result of Evidence Tampering

The sole issue on which Plaintiff's counsel was permitted to present additional evidence related to the question of whether the videos of APD's interrogation of Plaintiff were doctored in such a way to mislead the viewer about what took place during the interrogation.  To support his allegations of evidence tampering, Plaintiff has retained the services of Jerry Goffe, a "forensic

---

[6]   Although Plaintiff stipulated that his "corrected" motion to reconsider (Doc. 192) would be the controlling pleading, he makes numerous references in that pleading to the exhibits in the previous motion to reconsider (Doc. 191), adding to the confusion that already exists in his factual presentation.  *See* n.3, above.

video examiner," who examined several CD recordings of the Rowley and Lee interrogations. Before getting into the question of the reliability and relevance of Mr. Goffe's opinion, the Court notes that it could summarily reject Plaintiff's attempt to introduce new evidence at this point. The Court agrees with Defendant that Plaintiff's counsel has not established that he made a diligent, yet unsuccessful effort to discover the alleged tampering. *See Bell v. Bd. of County Comm'rs of Jefferson Cty,* 451 F.3d 1097, 1102 (10th Cir. 2006); *Webber v. Mefford,* 43 F.3d 1340, 1345 (10th Cir. 1994).   At no time prior to the Court's qualified immunity ruling did Plaintiff's counsel seek to independently review the recordings that were tagged into evidence or engage an expert to review them.   Mr. Aarons blames his client's "mental illness" and "vague memory" as a "justifiable excuse" as to why he failed to raise this claim earlier.  Doc. 193 at 3-4. He also asserts a "reasonable reliance" on the authenticity of the recordings, until the recent discovery that the recordings were altered by Defendants, *id.*, but this is not a tenable excuse.  As mentioned previously, counsel was always aware of Plaintiff's statements that he had requested an attorney, and counsel also would have been aware that there were interrogation recordings made.  Counsel was also aware of the conflict between Plaintiff's claim that he had requested a lawyer, and what the recordings revealed even during the time of the criminal proceedings.  *See* 192 at 13, ¶ x (noting that recordings omit any reference to Plaintiff requesting a lawyer).  The same alleged conflict came up again during discovery in this case when Plaintiff testified in his deposition that he asked for a lawyer (*see* Doc. 122, Ex. A, Pltff's Dep. at 91:4-22), despite the recordings that failed to memorialize that alleged request.  All of this was more than sufficient to alert Plaintiff's counsel to this issue.

In addition, the affidavit by Plaintiff's expert, Jerry Goffe, makes it very clear that the videos and recordings were readily accessible.  They marched right into APD to review the

physical evidence and collect copies of the videos that had been tagged into evidence.   Doc. 191-1 at 1, ¶ 4.   Also, the attorney for Michael Lee was able to copy these discs, and Plaintiff offers no reason why his counsel could not do the same prior to the Court's rulings on summary judgment based on qualified immunity.

On the due diligence factor alone, the Court could summarily reject any offering by Plaintiff of this addition evidence because it could have easily been unearthed prior to the Court's summary judgment ruling.

1.   *Daubert Issues - Qualifications*

Even assuming that Mr. Aarons had a justifiable excuse for not raising this issue earlier, in the end he presents no basis, either legally or factually, for the Court to reconsider previous rulings.   The Court did not intend to open this case up for a battle of the experts, but Plaintiff's choice of "expert" has made this procedure necessary.   The Court had required Plaintiff's counsel to support his allegations of evidence tampering through someone who was an information systems expert who "would be qualified to give an expert opinion about whether the videos were manipulated through the use of technology." Doc. 188 at 4.   Plaintiff's expert, Mr. Goffe, is not qualified to present such an opinion, and moreover, he uses no methodology that would prove to be helpful to the Court.   He merely viewed the recordings and compared them to the audio recording and transcript; the Court could have done the same and made the same conclusions.   On the other hand, the Defendants' expert, Russell Bennett, used a methodology well beyond viewing the tapes.   He examined the CD recordings in evidence as well as examined the devices used to record the interrogations.   Doc. 196-1 at 3-4.   Defendants request that the Court strike Mr. Goffe's testimony and opinions.

The Supreme Court has made clear that **A**where [expert] testimony's factual basis, data,

principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has >a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S. 579, 592 (1993)).  The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is >generally accepted= in the scientific community.@ *Mitchell v. Gencorp Inc*., 165 F.3d 778, 781 (10th Cir.1999).  Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements.  *Id*.  The Plaintiff in this case has not satisfied these requirements.

The Court agrees with Defendants that there are serious shortcomings in the qualifications listed on Mr. Goffe's  curriculum vitae ("CV").  Doc. 191-1 at 4.  Mr. Goffe  has a Bachelor's Degree in Civil Engineering and a Masters degree in Structural Engineering. He is basically a court videographer, holding various certifications such as a "Forensic Evidence Photographer" and "Certified Forensic Videographer" and belongs to numerous professional organizations such as the Evidence Photographers International Council and the Law Enforcement & Emergency Services Video Association.   However, he has no certifications, background or experience in information technology.  On the other hand, Mr. Bennett is a security video/audio expert and information technology engineer, with a degree in electronics. He identified inbound missile threats for the military by pulse width, radio frequency, and Crystal PRF, some of the same techniques he employed in this case so he could identify the frequency patterns of the recordings to determine if they were altered. Bennett Aff. at ¶ 2 (Exh. A).  He has been an IT professional for over 20 years and his experience includes installing the

same video system that is at issue in this case.  *Id*. at ¶ 3.  Mr. Bennett has taught in the area of computer forensics and has been called upon to retrieve and authenticate video recordings of the same type as he analyzed in this case.  *Id*. at ¶¶ 3-4.  He obviously possesses the education, skill, training and experience necessary for analyzing whether the recordings of Plaintiff's interrogation were altered.

Fed.R.Evid. 702 requires a witness to qualify as an expert by virtue of knowledge, skill, experience, training or education.  The Court finds that Mr. Goffe is not qualified under Rule 702 to present an opinion on the question of whether the interrogation recordings were altered, and that Mr. Bennett is qualified.  However, the Court will assume Mr. Goffe is qualified only for purposes of completing the *Daubert* analysis in order to show that Mr. Goffe's opinion falls short of *Daubert* in all respects.

2.     *Daubert Issues—Reliability and Relevance of Experts' Opinions*[7]

Both Mr. Goffe and Mr. Bennett found that two of the CDs ("CD-243" and "CD-188") which contained video recordings of the Rowley and Lee interrogations were pertinent to the inquiry.  Both individuals had available the audio recordings and official transcript of Rowley's interrogations.  The audio recording is referred to by Mr. Bennett as "CD-255."  Mr. Bennett confirmed that CD-255 contained recordings from the SONY handheld recorder.

Mr. Goffe's examination of the CDs was limited to viewing the two CDs and comparing them with the audio recording, and then concluding that the CDs had been altered manually.  Mr. Goffe opined that the two CDs were copies "made from one or more original recordings which

---

[7]  Plaintiff makes no reference to his expert's qualifications, or the reliability of Mr. Goffe's conclusions, and apparently assumes the Court will take Mr. Goffe's opinions at face value without performing its gatekeeping function under Rule 702.  Neither party requests a *Daubert* hearing, and the Court finds no need for a hearing on this issue, but rather makes its findings herein.  *See U.S. v. Nichole,* 169 F.3d 1255, 1262 (10th Cir. 1999) (a court's decision to admit expert testimony without conducting a *Daubert* hearing is reviewed for an abuse of discretion); *Robinson v. Missouri Pacific,* 16 F.3d 1083, 1089 910th Cir. 1994) (*Daubert* does not mandate a hearing, but requires the Court to carefully and meticulously review the proffered scientific evidence).

16

apparently were never tagged into evidence." Doc. 191-1, ¶ 9.   He also found that these copies were altered from the original, and that the differences between the two CDs were the "result of manual copying, not machine error." *Id.*, ¶14.   Mr. Goffe also concluded that: portions of the audio was spliced out of both videos where the interrogation shifts from an interrogation of Rowley to one of Lee and that based on the police transcript and audio, the interrogation continues for several pages beyond the splice; several portions of video are missing from the audio, namely two minute-long segments, where some of the video sections have no counterpart on the audio. Doc. 191-1.   Goffe also found that the "compression" of the video recordings was "puzzling" in that there would be "no legitimate reason to compress police video in this manner" and that "no detective office would purchase programs to edit and compress interrogations." Doc. 191-1, ¶ 15.

The analysis conducted by Defendants' expert, Mr. Bennett was as follows:  Mr. Bennett used working copies of the CD-243 and CD 188, but before conducting his analysis, he verified that the copies were identical to the discs tagged into evidence.   He also compared the two video recordings to each other and identified them as having identical content. Doc. 196-1 at 3.   With regard to the alleged discrepancies in the recordings, the pertinent question here is not whether discrepancies exist, but whether they were the product of evidence tampering.   As Defendant notes, Mr. Goffe concludes that the recordings were altered from the original, but he never states that he viewed the original.  Instead, Mr. Goffe states that he did *not* view the original and that the original was "undisclosed").  Doc. 191-1, ¶¶11, 14.  Mr. Goffe's comparison of the video recordings with the audio recording has nothing to do with whether the CDs were altered from the original, and it is absurd for him to claim that the recordings he viewed were altered from the original if he never saw the original.  This is not a flawed methodology—it is *no* methodology at

all.

There are other facts which, had Mr. Goffe made the most basic inquiry, would have precluded him from coming to any of the conclusions he made, including his conclusion that the original recording was "undisclosed" or lost.   The interrogation was recorded on the Toshiba DVR equipment which contains the original video content.  The machine is in a secure room, within a secure building with access only to certain police officers.[8]  This original video content cannot be disclosed or tagged into evidence because it is used to record all police interrogations. Instead, the procedure that is used is the creation of a master or original disc containing what the Toshiba DVR recorded, and that disc is tagged into evidence.  This is exactly the procedure carried out with regard to CD-188 and CD-243, and it is also the reason why the "original" (as Mr. Goffe puts it) was never tagged into evidence or disclosed.   As a result of his analysis and examination, Mr. Bennett confirmed that CD-188 and CD-243 were identical, that they were both master originals and that "one was not a copy made of a master original."  Doc. 196-1 (Bennett Aff.), ¶ 26.   In other words, the two CD discs in evidence are actually the master originals which were burned from the Toshiba DVR equipment, and not what Mr. Goffe refers to as CD "copies" of the original recording.

The next question tackled by Mr. Bennett was whether the master discs that were actually tagged into evidence in this case accurately reflect the original content contained on the Toshiba DVR machine.  Mr. Goffe never thought to make an inquiry in this regard, but Defendant's expert specifically examined this question.   As a result of this inquiry, Mr. Bennett found that the content of Plaintiff's interrogations were burned from the Toshiba DVR to master discs (such as CD-188 and CD-243) using propriety encryption software, propriety compression software, security indexing and other security protocols.  The content from the Toshiba DVR machine was

---

[8]   These facts, and others related to Mr. Bennettt's findings and opinions, can be found in his Affidavit, Doc. 196-1.

recorded on a "write-once disc," meaning it could not be overwritten with different content.  The gist of all this information is that the security precautions in place make the burning process from the Toshiba DVR machine to the master discs virtually impossible to alter.   Mr. Bennett's examination and analysis led to his conclusion that "both the recording contained in the DVR machine itself and the content burned from the machine to disc are nearly impossible to alter." Doc. 196-1, ¶ 15.

Neither Plaintiff nor Mr. Goffe raises an issue regarding the chain of custody of the master discs.  Mr. Bennett does address this issue, noting that Detective Morant had custody and control of the discs from the time they were created and given to him by Sergeant Argueta, who was the only person qualified to operate the DVR machine), to the time Detective Morant tagged them into evidence.  Doc. 196-1 at ¶39; Doc. 147-4 at 5 (Morant's testimony).  Thus, there is no evidence regarding a break in the chain of custody allowing an opportunity for the alleged tampering, even if such tampering were possible.

As to actual allegations of tampering, Mr. Goffe first claims that the video recordings did not contain portions of the audio of the audio recordings because of time stamp discrepancies and because of the abrupt shift in the video from Plaintiff's interrogation to the interrogation of Mr. Lee.  However, if Mr. Goffe's inquiry had gone beyond just viewing the recordings, he would have found that the discrepancies between the video recordings and the audio recording is not suspect at all.  Mr. Bennett did make these essential inquiries, and found that two different devices were used to record Plaintiff's interrogations.  A Toshiba DVR machine was used to record the video portion, and a Sony digital recorder was used to record the audio portion. Bennett Aff. (Doc. 196-1, ¶ 9).  The Toshiba DVR machine contained a clock that was about 30 minutes fast.  Therefore, the time stamps on the video recordings would reflect events occurring

30 minutes after those same events occurred on the audio recording.  Taking the 30-minute time difference into consideration, the adjusted start and end timed on the video recordings correspond to the start and end times recorded by the SONY.   The start and end times for the three portions of Plaintiff's interrogation on the Toshiba DVR are, respectively, 11:05 to 13:22, 13:52 to 14:58, and 16:05 to 16:16.  Mr. Bennett noted that these correspond to the start and end times on the SONY which are 11:02 to 13:20, 13:50 to 14:58 and 16:05 to 16:13.   Doc. 196-1, ¶28.   The very small remaining time differences amount to mere seconds, depending on which portion of Plaintiff's interrogation is considered, and can be accounted for by the fact that the DVR is operated by a different individual who is in a different room from the person who operates the SONY which records the audio.  As Mr. Bennett noted, because the Toshiba DVR was operated by a different individual than the SONY audio recorder, "it can be started earlier than the audio device."  Doc. 196-1 (Bennett Aff.), ¶ 29.  He explained that "[t]he two devices will never be started and ended at precisely the same times" and that this "can account for the time differences between the start and end times of the audio and video recordings."  *Id.*

Mr. Goffe acknowledges a 30-minute time discrepancy between the audio and video recordings, Doc. 191-1, ¶ 11, but he fails to take into account the wrong time shown on the Toshiba DVR machine, or the fact that two different devices were used to record Plaintiff's interrogations.  He makes no attempt to ascertain the reasons for these discrepancies other than blindly concluding that there was tampering with the recordings.   Mr. Goffe also claims that both video recordings are slightly different from each other based on a difference in the total time elapsed between the two.  Doc. 191-1 at 2, ¶ 13.   These differences are irrelevant.  The content of the two videos is identical with regard to Plaintiff's interrogation, and even Mr. Goffe acknowledges that the alleged differences in the videos occur after Plaintiff and the detectives

20

leave the room when the last interrogation is over.   Doc. 191-1 at 2, ¶13.   Mr. Goffe's final observation is that the video recordings were compressed.   He does not conclude that the compression resulted in any alteration, but only offers the opinion that no police department would purchase programs to compress videos.   Mr. Goffe does not appear to have any specialized knowledge or experience that would explain how he comes to know what computer software is used by police departments, and even if he did, Mr. Goffe does not offer any explanation at all as to the significance of his observation.

  3.     *Summary Comparison of Experts*

  The methodology performed by defense expert, Mr. Bennett, is set forth in detail and in clear fashion.   Mr. Bennett first verified that the copies of the recordings he reviewed were identical to those tagged into evidence.   Before even beginning an analysis of the recordings themselves to determine whether they were altered, he examined the recording devices themselves and consulted the equipment's owner's manual and an engineer for the manufacturer of the equipment in order to analyze the hardware and software.   Doc. 196-1 (Bennett Aff.), ¶¶ 7, 8, 9, 12.   The methodology utilized by Mr. Bennett can be described as including at least four different, independent and objective analyses:   (1) an analysis of the security protocols for burning the content of the interrogations from the Toshiba DVR machine to a master disc to determine whether an alteration could occur during that process, (2) a comparison of the video and audio recordings, taking into consideration the 30 minutes the video and audio were out of sync, (3) an independent verification of whether the videos were altered through the use of mixing software to analyze the acoustic patterns, and (4) a comparison of the video recordings to each other.   *Id.*, ¶ 40.   The following is an example of Mr. Bennett's method for ascertaining the accuracy of the videos:

21

> I watched each of the video segments in their entirety, looking for and noting on the transcripts the times of specific key video and audio queues, such as coughs, yawns, body positions and gestures, and watching for any unusual changes, jumps or skips.  Usually in video, one can see definite changes from one frame to the next.  The DVR is unique in its ability to go frame to frame watching for these changes.  In addition, there are three people in the video to observe, Detectives Fox and Morales, and Travis Rowley, making any of those changes more identifiable.  I was able to confirm in this manner that there were no missing portions of the videos.  Had there been, I would have notices, especially due to the ability to view the videos frame by frame.  . . . To further to [sic] ascertain the videos' accuracy, I used software and an audio mixer to extract the audio streams from each of the segments.  Then, using professional mixing software that looks at audio digital signature and frequency peaks, I began to match the acoustic and bitwise fingerprints form the videos to the audio from disc 255, which I already identified above as the master.  Using the noted examples of the video and audio queues that I previously identified, I was able to match the tracks from the video rips and those of the audio rips, noting there was no missing sequencing and no alterations.  Therefore, although the audio was sampled from two different sources, the DVR and the SONY recorder, the acoustic fingerprints authenticate the videos.

Doc. 196-1 (Bennett Aff.), ¶¶ 30-31.   As a result of his analysis, Mr. Bennett opined that Mr. Goffe's conclusion that the discs tagged into evidence were the result of manual copying and were altered was "incorrect."  *Id., ¶ 37.*

In contrast, Plaintiff expert Goffe did none of these things.  He never did anything beyond viewing the videotapes and listening to the audio recording.  He made no attempt to investigate the security protocols in place; to independently verify whether the videos were altered by analyzing acoustic patterns, or to compare the video recordings to each other to further ascertain whether either disc had been tampered with.   He never looked beyond the discs to determine the existence or location of an "original" recording.  Had he done so, he would have discovered the obvious reason for the 30-minute time discrepancy between the video and audio recordings.  Had he undertaken any semblance of a reliable process in comparing the recordings, Mr. Goffe would have been able to determine that missing portions in the audiotape, the shift between interviews and time discrepancies could all be objectively and definitively accounted

for.  Instead, Mr. Goffe saw inconsistencies, inquired no further, and immediately concluded this was evidence of alteration and tampering.

Ironically, portions of Mr. Goffe's own findings are not consistent with any evidence tampering.  He takes issue with the authenticity of the recordings tagged into evidence because of purported differences between the audio and video recordings, somehow concluding that manual alteration occurred.  At the same time, however, he does not question the authenticity of the audio recording, which he makes his lodestar, and concedes that it tracks the transcripts provided to the Court.  Doc. 191-1 at 1, ¶ 5 (Goffe's finding that one of the CD recordings track both the police transcript and official court reporter transcript of Rowley's interrogations); Doc. 196-1 (Bennett Aff.), ¶ 25 (noting that Mr. Goffe "admits that these audio files follow both police transcript and official court transcript of Rowley's interrogations, and concedes their authenticity").  There is no dispute as to the accuracy of the audio recording or the official interrogation transcripts, neither of which indicates that Plaintiff requested counsel.  *See* Doc. 191-1, ¶ 5.  This leaves Plaintiff's deposition testimony, which is undisputed (whether or not it is credible) and which indicates that at some point he requested counsel and then revoked that request in order to get the interrogation over with.

Having reviewed both experts' testimony and opinions, the Court finds Mr. Goffe to be unqualified to present an opinion on whether the interrogation recordings were tampered with, that his opinion is not based on any reliable methodology, and that as a result, his opinion and testimony is unhelpful to the Court.  Mr. Goffe failed to consider all the pertinent and readily available information which should have been considered when making his comparison.  He relied on no methodology other than doing what the Court could have easily done itself—make a comparison based solely on viewing and listening to the recordings.   The Court's gatekeeping

function ensures that expert testimony and opinion passes muster under Rule 702 and *Daubert*. Mr. Goffe has not met this threshold.  Under *Daubert,* a methodology does not have to be unassailable (in which case weight, and not admissibility would be the issue), but it does need to be reliable.  The use of reasoning is a process that could be considered sufficiently reliable under *Daubert*.  *See, e.g., Mariposa Farms, LLC v. Westfalia-Surge, Inc.,* 211 Fed.Appx. 760, 763 (10th Cir. 2007) (unpubl. opin.) (physician's use of a process known as reasoning to the best inference was sufficiently reliable to support admission of his expert testimony).  Even if Mr. Goffe chose to limit his "methodology" to viewing and listening to the recordings, he still failed to investigate easily obtainable information which would have resolved the observed discrepancies in the recordings.  This is not the use of a methodology that is scientifically sound and comports with *Daubert*; nor is it the use of sheer reasoning in a reliable manner.

As a result of this finding, the Court accepts the only expert evidence available, which is the Bennett opinion and testimony, where he concludes that the video and audio recordings are authentic and unaltered.  Doc. 196-1 (Bennett Aff.), ¶. 40.

E.       Plaintiff's "Additional Facts" Regarding Alteration or Splicing of Videos

Plaintiff presents "facts" regarding the alteration or splicing of the videos.   However, many of these "facts" are loosely based on Mr. Goffe's opinion testimony.  *See, e.g.,* Doc. 192 at 13:¶¶x, y, & z.   Since the Court has found Mr. Goffe's opinion to be inadmissible, none of these proffered facts have any merit or any significance as far as presenting evidence that the interrogation recordings were altered or tampered with.   Other "facts" presented by Plaintiff's counsel grossly mischaracterize Mr. Goffe's actual findings in his affidavit.  For example, Plaintiff's counsel relies on Mr. Goffe's affidavit testimony to assert that the video was condensed "in a way to prevent access by the prosecuting attorney, defense counsel, and

investigators," Doc. 192 at 11, ¶s, but this statement or implication is nowhere to be found in Mr. Goffe's affidavit.  Still other "additional facts" presented by Plaintiff are immaterial or internally inconsistent.  For example, Plaintiff attempts to infer some kind of wrongdoing on the part of Deputy District Attorney David Waymire because Waymire heard the audio recordings of the interrogation and read the transcripts, but never viewed the video recordings.  *See* Doc. 192 at 14, ¶ad. (Deputy District Attorney David Waymire never knew two different videos of Rowley's interrogation had been edited and condensed, each slightly different from each other and the Audio which was transcribed.").   The Court cannot fathom, and Plaintiff never explains, why Waymire's conduct is suspect because he never viewed the video recordings.

As another example of a pointless "additional fact," Plaintiff implies that the audio recording of Plaintiff's interrogation was inaccurate:

> At the motion to suppress, the parties and expert witness relies solely upon a transcript of the Audio and assumed that transcript to be accurate and complete as to what Rowley said.  As a result, the court and to some extent counsel discounted Rowley's recollection of having demanded a lawyer. . . And with the testimony of Rowley contradicted by the detective reports and the Audio, there was at best a disputed claim to a *Miranda* violation. . . .

Doc. 192 at 14,¶ ae.  In this "additional fact," Plaintiff makes the implication regarding the authenticity of the audio recordings which is completely at odds with his stance throughout the briefing, as well as with the findings of his own expert, Mr. Goffe.  *See* Doc. 191-1 at 1, ¶ 5 (Goffe's finding that one of the CD recordings track both the police transcript and official court reporter transcript of Rowley's interrogations).   Moreover, Plaintiff mischaracterizes the state court's ruling on the motion to suppress as relying solely on an allegedly altered audio recording, when the actual court ruling expressly states otherwise, referring to the Court's reliance on testimony and counsel's argument as well.  *See* Doc. 122-21.   In his reply, Plaintiff goes at this issue again, inferring that since

Plaintiff's request for counsel was not recorded, it must have happened during one of the breaks, and since there is no recording of a waiver on either the audio or video recordings, Plaintiff could not possibly have waived his right to counsel.   Doc. 201, reply at 12-13.   The problem is that there is no evidence or additional facts or testimony to support this conjecture, and it is in fact directly contradicted by Plaintiff's testimony that he did revoke his request for counsel.  It is unfathomable that counsel would nevertheless continue to argue that something occurred outside of what was recorded without any evidence of this having occurred.

From this sampling, it should be evident that Plaintiff's "additional facts" offer nothing of relevance or value on the *one* issue Plaintiff's counsel was allowed to investigate in filing a motion to reconsider: whether the video recordings of Plaintiff's interrogation were manipulated through the use of technology.  In presenting all kinds of facts, most of which have nothing to do with the one issue on which he was allowed to present evidence, Plaintiff has failed to present any credible evidence to suggest evidence tampering and therefore no reason for the Court to reconsider its previous rulings granting summary judgment to Defendants.

## II.     Plaintiff's Motion to Amend (Doc. 193)

The grant or denial of leave to amend under Fed.R.Civ.P.15(a) is a matter within the discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1971); *Castleglen, Inc. et al. v. R.T.C.,* 984 F.2d 1571 (10th Cir. 1993).    A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *See TV Communications Network, Inc., v. Turner Network Television, Inc.*, 964 F.2d 1022, 1028 (10th Cir.1992); *Watson v. Beckel*, 242 F.3d 1237, 1239-40 (10th Cir. 2001) (a proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason, including that

26

the amendment would not survive a motion for summary judgment).

In filing a motion to amend before the Court ruled on his motion to reconsider, Plaintiff's counsel was not premature, but unduly optimistic. There is no basis for amending the complaint, because, based on the Court's foregoing discussion, Plaintiff has offered no additional evidence that would form the basis for a viable claim. Thus, Plaintiff's motion to amend shall be denied.

## III.  Defendants' Request for Attorney Fees

Defendants contend that Plaintiff's counsel has violated Rule 11 by filing this Motion to Reconsider, and request fees under that rule and, alternatively, pursuant to 28 U.S.C. § 1927. The Court will consider the issue of sanctions at a later time in a separate proceeding.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiff has not offered any evidence on the one issue on which the Court allowed Plaintiff to present additional evidence, which is whether the interrogation recordings of Plaintiff were doctored in such a way to mislead the viewer about what took place during the interrogation.   Plaintiff has also attempted to relitigate many of the same issues which the parties have already briefed and which the Court has already addressed.

With respect to the issue of alteration or tampering of the interrogation recordings, Plaintiff presents facts which rely on the findings of his expert, Jerry Goffe.  However, in the Court's *Daubert* analysis of Mr. Goffe's qualifications, opinions and affidavit testimony, the Court finds and concludes that (1) Mr. Goffe is not qualified to perform an analysis as to the authenticity of the recordings; and (2) the methodology used, which consisted simply of viewing and comparing the recordings, is unreliable because it is not based on any specialized knowledge and because Mr. Goffe failed to take into account numerous factors and pertinent information when making his comparison of the recordings.  Mr. Goffe's opinion and testimony is therefore

27

unhelpful on the issue of evidence tampering of the recordings.  Accordingly, the Court agrees with Defendants that Mr. Goffe's testimony and opinions fail to satisfy requirements of reliability and relevance under *Daubert* standards, and as a result, shall be stricken, as Defendants request.

The Court has also determined that Defendants' expert, Russell Bennett does have the qualifications required under *Daubert* to proffer an opinion regarding the authenticity of the video recordings of the interrogation, and that his methodology qualified under Rule 702 and *Daubert* in terms of reliability and relevance.   Thus, the Court accepts and hereby adopts Bennett's conclusion that the video and audio recordings are authentic and unaltered.  Doc. 196-1 (Bennett Aff.), ¶. 40.   The Court has considering all the evidence presented by both parties regarding Plaintiff's allegations of evidence tampering, and hereby concludes that all of the alleged discrepancies among the recordings are perfectly and legitimately explainable, and do not suggest the recordings tagged into evidence were in any way altered.  Plaintiff's accusations of evidence tampering are completely devoid of merit.  Plaintiff having failed to present any evidence of tampering, the Court will not reconsider or modify its ruling granting summary judgment to Defendants (Doc. 188).  Further, based on the Court's refusal to reconsider the award of summary judgment to Defendants, the Court denies Plaintiff's motion to amend as such amendment would be futile in view of the Court's rulings.

Finally, the Court shall retain jurisdiction to consider Defendants' request for sanctions which will be subsequently considered in a separate proceeding.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Corrected Motion for Reconsideration of Memorandum Opinion and Order (Doc. 188) Granting Individual Defendants' Motion for

Summary Judgment Based on Qualified Immunity (**Doc. 192**) is hereby DENIED for reasons described in this Memorandum Opinion and Order;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Amend Complaint, (**Doc. 193**) is also DENIED for reasons described in this Memorandum Opinion and Order.

A Rule 58 Judgment shall issue.

_____

UNITED STATES DISTRICT JUDGE